IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KIRK D. MATELYAN                          *
                                          *
          Plaintiff,                      *
                                          *
v.                                        *          Civil No. **PJM 10-2626**
                                          *
**SAGE DINING SERVICES, Inc.**            *
                                          *
          Defendant.                      *

## MEMORANDUM OPINION

*Pro Se* Plaintiff Kirk Matelyan has sued his former employer, SAGE Dining Services,

Inc. ("SAGE"), alleging violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

12111 *et seq.*, in connection with his termination as SAGE's Food Service Director.[1]  On

October 6, 2011, SAGE filed a Motion for Summary Judgment [Paper No. 48], which the Court

denied without prejudice, extending discovery until February 21, 2012 and directing SAGE to

file another dispositive motion thirty days thereafter.  SAGE has timely filed a Renewed Motion

for Summary Judgment [Paper No. 63].  For the reasons that follow, the Court will **GRANT**

SAGE's Renewed Motion for Summary Judgment.[2]

### I.

SAGE is a Delaware corporation engaged in the business of providing food service

management to private schools, colleges, and businesses.  Kirk Matelyan worked at SAGE as a

Food Service Director from December 2005 until he was discharged on October 13, 2006.

While at SAGE, Matelyan was assigned to manage food service operations at Saint John's

---

[1] Matelyan also alleged various state law claims, which the Court dismissed in a Memorandum Order issued on January 18, 2011. The case proceeded solely as to his ADA claim.

[2] On April 30, 2012, the Court issued a Memorandum Order denying Matelyan's request to extend discovery and to compel the production of various documents [Paper No. 72]. Matelyan has filed a Motion to Reconsider [Paper No. 76] and a Renewed Motion to Compel Discovery [Paper No. 77]. For the same reasons stated in the Court's Memorandum Order of April 30, the motions are **DENIED**.

College High School in Washington, D.C., and later at the Maritime Institute of Technology and Graduate Studies in Linthicum Heights, Maryland.  He managed food service employees, filed payroll reports, performed sales activities, managed client accounts, secured funds received, and made bank deposits on behalf of SAGE.

According to the job description provided by SAGE, a Food Service Director must be a highly energetic and possesses, among other qualities, strong leadership and managing abilities, culinary knowledge, organizational skills, and computer literacy.  A Food Service Director is SAGE's primary representative on campus and is responsible for all aspects of the account, including catering, retail service, production, sanitation, and financial performance.  The job responsibilities include overseeing the production process, merchandising and marketing operations, managing the staff, financial management, and client relations.  To perform these duties, a Food Service Director must meet certain minimum physical requirements.  As set forth in the company's job description, he or she "must be able to properly lift objects weighing 20 lbs. or less continuously, 35 lbs. or less frequently, [and] 50 lbs. or more occasionally."  He or she must also "be able to push/pull objects with moderate efforts frequently, [with] [m]aximum effort occasionally," "be able to sit and/or stand 4 hours continuously, up to 8 hours per day," and to "remain on [his or her] feet for [the] entire shift."  Finally, he or she "must be able to manipulate objects with close hand-eye and/or arm coordination for [the] entire shift, [and] to perform motor skills such as grasping, finger manipulation, bending, reaching out, twisting, turning, reaching up, wrist turning/torqueing continuously."

All SAGE employees, including a Food Service Director, must comply with the company's detailed cash-handling policy.  SAGE requires those in charge of handling bank deposits to make "one deposit that exactly equals the amount of cash sales of the day."  This

policy ensure that "large quantities of cash" are not "stored in the units overnight or over a weekend," thereby reducing the risk of theft and other attendant hazards.

According to Matelyan, on August 26, 2006 he injured his neck and back while assisting banquet staff in the removal of dining room tables weighing 50 to 75 pounds. He sought medical attention from Dr. Peter Stengel, who on September 27, 2006 diagnosed him with a "bulging or ruptured disc." Dr. Stengel prescribed Percocet, Methylprednisolone, and Chlorzoxazone and instructed Matelyan to refrain from working until his next appointment a week later. Given his medical condition, Matelyan asked his supervisor, Rachel Elstad, for help, but he was not permitted to take time off or to get assistance from other employees. When he told Elstad that he "wasn't in good shape to drive" because of the medication he was taking, she refused to assign someone else to make the bank deposits and instead said Matelyan could "leave the unit during the day to make the deposits." Matelyan, however, never availed himself of this accommodation because he did not think it was "safe" to leave the other employees alone.

During the first two weeks of October, Matelyan failed to make daily deposits of cash sales as required by company policy. His breach of cash-handling procedures was brought to SAGE's attention by parents who complained about their checks not being cashed. The accounting department investigated the issue and discovered that Matelyan had allowed an excessive amount of cash and checks to accumulate on site. SAGE's General Counsel, Christina Rodriguez, made the decision to discharge Matelyan after she learned of his "serious and material" failure to follow cash-handling procedures. On October 13, 2006, SAGE terminated Matelyan's employment.

Dr. Stengel prepared a medical report for Matelyan on February 1, 2007, which stated that he would still be under certain "permanent" restrictions if he returned to work. Specifically,

Dr. Stengel advised that Matelyan would be unable to lift more than five pounds, to remain

standing for more than one hour, or to engage in repetitive bending, stooping or climbing,

although his condition might "improve after spinal surgery."

In December 2006, Matelyan filed a complaint with the EEOC, alleging that SAGE

discriminated against him on the basis of a disability and retaliated against him for requesting

reasonable accommodations. On January 29, 2010, the EEOC issued a Dismissal and Notice of

Rights Letter. Matelyan subsequently filed suit against SAGE in state court, which SAGE

removed to this Court. The Court now considers SAGE's Renewed Motion for Summary

Judgment.

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.

R. CIV. P. 56(a). The court must "view the evidence in the light most favorable to . . . the

nonmovant, and draw all reasonable inferences in his favor without weighing the evidence or

assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d

639, 644-45 (4th Cir. 2002). The court, however, must also abide by the "'affirmative obligation

of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'"

*Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003)

(quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)). "A party opposing a properly

supported motion for summary judgment may not rest upon the mere allegations or denials of

[his] pleadings, but rather must set forth specific facts showing that there is a genuine issue for

trial." *Id.* at 522 (alteration in original) (internal quotation marks and citation omitted). The

mere existence of a "'scintilla of evidence'" is not enough to frustrate a motion for summary

judgment. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (quoting

*Phillips v. CSX Transp., Inc.*, 190 F.3d 285, 187 (4th Cir. 1999)).  Summary judgment is

appropriate "unless there is sufficient evidence favoring the nonmoving party for a jury to return

a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Although *pro se* pleadings are "held to less stringent standards than formal pleadings

drafted by lawyers," *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972), they "must still set forth

facts sufficient to withstand summary judgment." *Symeonidis v. Paxton Capital Grp., Inc.*, 220

F. Supp. 2d 478, 480 n. 4 (D. Md. 2002) (citations omitted).

### III.

Matelyan alleges that he was terminated in violation of the ADA.  SAGE responds that

Matelyan's claim fails as a matter of law because his injuries disqualified him from performing

the essential functions of his position, with or without a reasonable accommodation, and he was

therefore outside the protective scope of the ADA.  Furthermore, SAGE argues, Matelyan was

not fired because of his disability, but because of his failure to follow SAGE's cash-handling

policy.

The ADA provides that "[n]o covered entity shall discriminate against a qualified

individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms,

conditions, and privileges of employment."  42 U.S.C. § 12112(a).  To succeed on his claim for

discriminatory discharge, Matelyan must show (1) that he is within the ADA's protected class;

(2) that he was discharged; (3) that at the time of his discharge he was performing the job at a

level that met his employer's legitimate expectations; and (4) that the circumstances of his

discharge raise a reasonable inference of unlawful discrimination.  *Haulbrook v. Michelin North*

*America*, 252 F.3d 696, 702 (4th Cir. 2001) (citing *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio*, 53 F.3d 55, 58 (4th Cir. 1995)).

### A.

SAGE's first contends that Matelyan is not protected by the ADA because he was not an otherwise qualified individual able to perform the essential functions of his position.  The Court agrees and finds that Matelyan has failed to sustain his burden as to this essential element of his claim.

To fall within the ADA's protected class, Matelyan must show that he is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  For purposes of its Renewed Motion for Summary Judgment, SAGE has conceded that Matelyan was disabled within the meaning of the ADA.  The Court must decide, therefore, "(1) whether [he] could 'perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue,' and (2) if not, whether 'any reasonable accommodation by the employer would enable [him] to perform those functions.'"  *Tyndall v. Nat'l Educ. Ctrs., Inc. of California*, 31 F.3d 209, 213 (4th Cir. 1994) (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393-94 (5th Cir. 1993)).  Evidence of what functions are *essential* includes, among other things, the employer's judgment as to which functions are essential, the written job descriptions prepared before advertising or interviewing applicants for the job, the amount of time spent on the job performing the function, or the consequences of not requiring the person to perform the function.  *Fleetwood v. Harford Sys., Inc.*, 380 F. Supp. 2d 688, 698-99 (D. Md. 2005) (citing 29 C.F.R. § 1630.2(n)(3)).

Here, SAGE's written job description for Food Service Director included the requirement that the employee be able to lift and carry objects over twenty pounds and to sit and/or stand continuously for four hours, up to eight hours per day.  The medical records show that, after Matelyan injured his neck and back on August 26, 2006, he could no longer lift more than five pounds or remain in a standing position for longer than one hour.  These "permanent" restrictions prevented him from performing some of the job functions SAGE deems essential, including being able to lift objects 20 pounds or less continuously, to sit or stand four hours continuously, and to perform motor skills like bending and twisting.  Matelyan has offered no evidence to show that these functions are not in fact essential.

The Court considers next whether "any reasonable accommodation" by SAGE would have enabled Matelyan to perform the essential function of a Food Service Director.  The ADA provides that reasonable accommodations may include "job restructuring," "part-time or modified work schedules" or "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B).  An accommodation that requires the elimination or reallocation of an essential job duty, however, is not reasonable.  *Champ v. Baltimore Cnty.*, 884 F. Supp. 991, 999 (D. Md. 1995) (citing *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1078 (6th Cir. 1988); *see also Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 323 (4th Cir. 2011) (noting that employers are not compelled to "reallocate essential job functions or assign an employee permanent light duty") (internal quotation marks and citation omitted); *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 687 (4th Cir. 1997) (observing that the ADA does not require an employer to hire additional workers to perform an essential function of a disabled employee's position).  Furthermore, the ADA does "not require an employer to give a disabled employee 'an indefinite period of time to correct [a] disabling condition' that renders him unqualified." *Halpern v. Wake Forest Univ.*

*Health Sciences*, 669 F.3d 454, 465 (4th Cir. 2012) (quoting *Myers v. Hose*, 50 F.3d 278, 280 (4th Cir. 1995)).  The undisputed record shows that, for an *indefinite* period of time, Matelyan was unable to lift weights heavier than five pounds, to stand for prolonged periods of time, or perform basic motor skills like bending—essential functions of his job.  No reasonable accommodation would have permitted Matelyan to perform these functions of a Food Service Director.[3]

Since Matelyan has failed to raise a triable issue as to whether he falls within the ADA's protected class, SAGE is entitled to summary judgment.

## B.

Even if Matelyan could show that he is within the ADA's protected class, his claim would still fail because he has presented no evidence to establish that he was terminated *because* of his disability, rather than due to his failure to follow SAGE's cash-handling policies.

The law is clear that an individual's disability must be "a motivating cause" of the termination for that individual to recover under the ADA.  *Halpern*, 669 F.3d at 462 (quoting *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468-69 (4th Cir.1999)).  Persons protected under the ADA may be lawfully discharged for misconduct even if the misconduct is related to a disability.  *Id.* at 465 (citing *Martinson*, 104 F.3d at 686 n.3).  In particular, adverse action against disabled individuals is generally lawful if it results from "application of a neutral rule that applies to disabled and nondisabled individuals alike," unless application of the rule "was a pretext for discrimination and that the true reason for [a plaintiff's] exclusion was h[is] disability."  *Baird*, 192 F.3d at 468 n.6.  The ADA, it bears repeating, protects disabled individuals from

---

[3] Indeed, an individual confined to light sedentary work could not handle the many critical jobs of a Food Service Director.

discrimination because of their disability, not from adverse employment actions in general.  42
U.S.C. § 12112(a).

Matelyan concedes that he violated SAGE's cash-handling policy by failing to make
daily bank deposits, which was the sole ground SAGE gave for discharging him.  The record
shows that Rodriguez made the final decision to terminate Matelyan after she learned of his
"serious and material" breach of company cash-handling procedures from an internal accounting
department investigation, prompted by complaints from parents who told SAGE that their checks
had not been cashed.  Matelyan does not proffer any evidence to suggest that his disability—not
violation of company policy—was the reason for his discharge.[4]  In fact, there is nothing in the
record to suggest that Rodriguez was even aware of his injuries.  Matelyan also provides no
evidence that the cash-handling policy was applied to him in a discriminatory fashion.[5]  Absent
such a showing, his termination does not permit a reasonable inference of discrimination, another
reason why his ADA claim cannot survive summary judgment.

## IV.

For the foregoing reasons, the Court **GRANTS** SAGE's Renewed Motion for Summary
Judgment [Paper No. 63].  Final Judgment will be entered in favor of SAGE and the case will be
**CLOSED**.

---

[4] Matelyan claims, with no evidentiary support, that the medication he was taking prevented him from safely
operating a motor vehicle and thus from making the daily bank deposits. It is unclear whether this alleged
connection between his disability and the violation of the policy is legally relevant. *See Halpern*, 669 F.3d at 465
("'[M]isconduct—even misconduct related to a disability—is not itself a disability' and may be a basis for
dismissal." (quoting *Martinson*, 104 F.3d at 686 n.3)). In any event, the record shows that when Matelyan discussed
the problem with Elstad, she told him to leave his work site to make the deposits during the day, and Matelyan
refused because he did not think it was "safe" to leave the employees alone. The fact that his rationale for rejecting
the accommodation had nothing to do with his disability undermines his assertion that his failure to follow the
policy was a plausible consequence of his disability.
[5] It is true, as Matelyan argues, that the policy says that violators will receive written warnings and may eventually
be moved from cash-handling to another position, not immediately terminated. But Matelyan has not shown that the
decision to terminate him due to his violation of the cash-handling policy was *based on his disability*. Absent such a
showing of discrimination, it is immaterial that SAGE decided to terminate him without giving him written
warnings. No claim of wrongful discharge is before the Court.

A separate Order will **ISSUE**.

/s/
_____
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

August 24, 2012